# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ASHLEY SMITH o/b/o M.G.S., | ) | CASE NO. 1:20-CV-01365 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Ashley Smith (Smith), acting on behalf of MGS, a minor (MGS) challenges the final decision of Defendant Kilolo Kijakazi,[1] Acting Commissioner of Social Security (Commissioner), denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq*. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R. 19). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    Procedural History

On February 27, 2017, Smith filed her application for SSI benefits on behalf of her minor child MGS, alleging a disability onset date of November 25, 2003. (R. 11, Transcript (Tr.) 146). The application was denied initially and upon reconsideration, and Smith requested a hearing

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d).

before an Administrative Law Judge (ALJ). (Tr. 82, 90). Smith and MGS participated in the hearing on March 26, 2019, were represented by counsel, and testified. (Tr. 36-52). On June 4, 2019, the ALJ found MGS not disabled. (Tr. 7-26). On March 1, 2020, the Appeals Council (AC) denied Smith's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-6). Smith filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 13, 16, 17).

## II.    Personal Background Information

MGS was born on *** 2003 and was 15 years old on the date of the hearing. (Tr. 15). Accordingly, MGS was an adolescent on the application date and considered an adolescent for Social Security purposes. *See* 20 C.F.R. § 416.926a(g)(2)). MGS was born with a left-hand deformity and has a long history of ADHD as well as depression and anxiety. (Tr. 14).

## III.   Evidence
### A.     Relevant Medical Evidence[2]

#### 1.     Treatment Records

On June 3, 2015, MGS treated with Vivian Diana Timperman, M.D., to follow up for attention-deficit/hyperactivity disorder (ADHD). (Tr. 251). On physical exam, Dr. Timperman noted that MGS appeared well, had a normal affect, and was doing well in school. (Tr. 251). MGS reported decreased appetite as a side effect from his medications. (Tr. 251). MGS continued to regularly follow up with Dr. Timperman through June 2018. These records are summarized as follows:

---

[2]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignments of error raised.

In October 2015, MGS reported feeling sad, struggling with homework and math. (Tr. 257). In November 2015, MGS reported decreased appetite and issues with sleep at night, but that his grades had improved. (Tr. 260). In February 2016, MGS was doing better emotionally and well in school, but had issues with sleep. (Tr. 262). MGS continued to do better in school and have sleep issues through March 2016. (Tr. 262). In May 2016, MGS had been off his medications for ten days and was having difficulty in school. (Tr. 266).

In August 2016, Dr. Timperman noted MGS did not take his medication over the summer. (Tr. 274). In November 2016, Smith reported MGS's behavior was defiant with her, and that he said he wanted to live with his father. MGS had no behavior problems at school. (Tr. 275). In March 2017, Dr. Timperman noted MGS's recent testicle surgery and that he was doing well on Adderall. (Tr. 278-79).

In July 2017, MGS reported that he was feeling depressed and had thought about self-harm four years prior but had not acted on those thoughts. Dr. Timperman diagnosed MGS with unspecified depression type. (Tr. 281). In October 2017, MGS reported daily feelings of depression, but that he did not want to go to counseling. He reported no thoughts of self-harm although he attempted the same five years earlier. (Tr. 283). Dr. Timperman advised him to start counseling and prescribed Wellbutrin. (Tr. 288). In November 2017, Dr. Timperman noted MGS started counseling, but Smith opted against giving him Wellbutrin and he was not taking any ADHD medications. (Tr. 289). MGS continued to do well in school. (Tr. 289). In December 2017, MGS reported that he was attending counseling and doing better with his depression, although he still experienced symptoms. (Tr. 294). He had difficulty concentrating. (Tr. 294).

In January 2018, Smith reported that MGS was more interactive and positive since taking Wellbutrin and has some minor attention problems at school but was doing well. (Tr. 298). In

February 2018, MGS was doing very well with attention at school and was less depressed. (Tr. 299). In April 2018, Dr. Timperman noted that MGS's ADHD was very stable, and that he had mild feelings of depression lasting about two hours after school twice per week. Dr. Timperman discussed an evaluation for a prosthesis for his hand. (Tr. 304). In June 2018, MGS was doing very well with his depression and ADHD, was doing well in counseling, and was hoping to get a hand prosthesis. (Tr. 308).

In September 2018, MGS saw Nurse Practitioner Carol Reece to follow up regarding ADHD. (Tr. 310). MGS was doing well in school and had achieved his goals to improve in social relationships, decrease disruptive behavior, improve academically, increase independence in self-care and homework, and improve his self-esteem. (Tr. 311).

The record contains counseling documents from October 2018 to December 2018. (Tr. 228-249). In October 2018, MGS underwent a diagnostic assessment with Jeff W. Gray, MFT. (Tr. 235). MGS reported addictive behaviors and periodic depression and anxiety. (Tr. 233, 238). MGS did not believe he needed to see a counselor and shared that his social problems were due to a hand deformity. (Tr. 234, 238). Most of his social interaction was online, and he lacked motivation to meet the challenges of school and life; "[h]e is a good student but not challenged academically, he does what he needs to do to get by." (Tr. 234, 238). Therapist Gray suggested weekly therapy sessions or sessions as needed. (Tr. 235).

On November 8, 2018, Therapist Gray noted MGS had taken some steps to better his self-esteem, including lifting weights. (Tr. 239). MGS reported he was learning to deal with his physical disability. (Tr. 239). On November 28, 2018, MGS shared his goals for the future, including going to a vocational school for computer science and obtaining a college degree in computer engineering. He continued to lift weights and progress in school. (Tr. 242).

4

On December 5, 2018, Therapist Gray noted MGS's self-esteem was growing due to lifting weights and becoming more outgoing. (Tr. 244). MGS was "com[ing] out of himself socially" and was more interested in school. (Tr. 245). On December 13, 2018, Therapist Gray noted MGS continued to lift weights and progress in school; "[h]e has set goals for himself and the main overarching goal is to keep him[self] on track to be productive in life." (Tr. 247). On December 19, 2018, MGS's self-image continued to improve, and he continued to exercise. (Tr. 249). Therapist Gray noted MGS liked to debate a variety of issues. (Tr. 249).

### 2.    Medical Opinions Concerning MGS's Functional Limitations

On June 8, 2017, MGS underwent a consultative psychological examination with T. Rodney Swearingen, Ph.D. (Tr. 223). Dr. Swearingen reviewed a prior psychological evaluation, and progress notes. (Tr. 223). Dr. Swearingen noted that MGS attended counseling once per week for two years, attempted suicide in 2014, was taking psychotropic medication and had never been admitted to a psychiatric hospital. (Tr. 224). Smith reported that MGS spent his days playing video games, jumping on the trampoline and playing with his dogs. (Tr. 224). She stated that he socialized with his two best friends and helped with chores around the house. (Tr. 224). Smith noted that MGS did not handle frustration satisfactorily, did not use good coping skills, and sometimes understood when to ask for help. (Tr. 224). On examination, Dr. Swearingen noted as follows: MGS' fine motor skills were impaired due to his left-hand malformation and his gross motor skills were unimpaired; his receptive and expressive speech was unimpaired; his mood was guarded; and his affect was stable and cooperative. (Tr. 224-25). MGS took medications to help with sleep issues and felt worried and depressed. (Tr. 225). MGS reported that he becomes anxious and nervous when in public places, his anxiety centers around his hand, and he experienced panic attacks twice per month. (Tr. 225).

Dr. Swearingen further assessed MGS's abilities and limitations regarding using information, attending to and completing tasks, interacting and relating to others, and self-care. (Tr. 226).[3] Regarding MGS's abilities and limitations in interacting and relating with others, Dr. Swearingen noted that MGS gets anxious around other children he does not know due to his hand, and that he had been bullied in the past. (Tr. 226). Dr. Swearingen noted that MGS had two or three friends at school; he had a good relationship with his teacher, but sometimes he would come home upset with them and he was resistant toward his mother who had to remind him to do things. (Tr. 226). Dr. Swearingen concluded that MGS struggled with understanding and acceptance from his peers and had "some carry over to his mother." (Tr. 226).

Dr. Swearingen concluded that MGS's

> Mental illness affects his school and home behavior in regards to following directions, concentration, interpersonal relationships, and stress tolerance. He handles stress at school by getting angry and then comes home and shares with his mother.  The claimant worries about adult problems and maybe these that keep him from facing his own issues. He is also depressed about his father not being in his life now. The claimant gets self-conscious about his hand and has difficulty in the school setting.

(Tr. 226).

On June 23, 2017, Kristen Haskins, Psy.D., opined that MGS had no limitations in the domains of attending and completing tasks and health and physical well-being, and had less than marked limitations in the domains of acquiring and using information, interacting and relating with others, moving about and manipulating objects, and caring for himself. (Tr. 62-63). On August 20,

---

[3]  Smith's challenge to the Commissioner's decision herein is limited to the ALJ's evaluation of MGS's functional limitations in the domains of interacting and relating to others and moving/manipulating objects. Dr. Swearingen did not consider moving/manipulating objects, therefore, the only relevant discussion in is that of MGS's limitations regarding interacting and relating to others.

2017, Frank Stroebel, M.D. concurred with Dr. Haskin's opinion. (Tr. 76).

### B.    Relevant Hearing Testimony

During the March 26, 2019 hearing, MGS testified as follows:

- He gets mainly B's and C's in school, has never had an IEP or other special plan at school, and has never been in special education. (Tr. 42). His ADHD medications help him pay attention. *Id.*

- Depression and anxiety affect his ability in school. *Id.* He did not need counseling in October through December of 2019 because he believed he had improved. (Tr. 43). He experienced depression and anxiety when not taking his medicine. *Id.* He is anxious when around a lot of people and when he does not cover his hand. *Id.*

- Depression medication helps. *Id.* He enjoys video games, swimming, and is in a choir. (Tr. 43). He was born with a left hand deformity. (Tr. 42). He cannot use his left hand to operate a controller, and uses a keyboard. (Tr. 43). He usually avoids using his left hand unless he cannot use his right. (Tr. 44). He lifts weights with his friend and can support his body weight with his left arm to do push-ups. (Tr. 45). Because his fingers are short, he cannot bend them to hold or grasp things. *Id.* He cannot button buttons, wash or itch his right arm; he cannot play most sports, and has trouble washing dishes and tying shoes. (Tr. 46).

- He does not talk to others in school unless he knows them. (Tr. 45). He is well behaved in school and on grade level academically. *Id.*

Smith testified to the following:

- MGS does not like to be around a lot of people and gets anxious in public. (Tr. 47). He is self-conscious about his left hand. *Id.* He has trouble doing things at home like washing dishes, emptying the trash, or holding plates. *Id.* He cannot play most sports, and when he tried, he was bullied. *Id.* He was bullied in school. *Id.* He was in counseling and on medication for anxiety and depression. *Id.*

- MGS has been on medication for ADHD since first grade. (Tr. 47). He has never needed an independent educational plan (IEP) or repeated a grade. *Id.* When his ADHD is treated, he works at a competitive level for his age in school. (Tr. 48). He has issues with sleep due to his medication, and sometimes says it makes him feel emotionless. (Tr. 50).

- MGS has always struggled with depression and anxiety, but it got worse when he was bullied in seventh and eighth grade. (Tr. 48). She felt MGS played computer games because no one would see his left hand and he could intact with his friends over the video games. (Tr. 49). He has a few school friends. *Id.* MGS does not like

to go anywhere by himself. (Tr. 50).

- MGS needs reminders to take medication and to do regular self-care tasks such as putting on deodorant and brushing his teeth. (Tr. 49). By the time he gets home from school his ADHD medication has worn off and he needs reminders to complete homework. (Tr. 49-50). Smith helps MGS with anything that he has to do on his right arm or that requires two hands. (Tr. 51).

## IV.  Disability Standard

The standard for evaluating a child's disability claim is different from the standard used for an adult disability claim. *Hernandez v. Astrue,* No. 1:10CV1295, 2011 U.S. Dist. LEXIS 118601, at *9 (N.D. Ohio Sep. 28, 2011) (citing 42 U.S.C. § 1382c(a)(3)(C)(i)); *Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002)). A child is disabled if he or she has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

An ALJ must proceed through a sequential analysis to determine whether a child is entitled to childhood SSI. 20 C.F.R. § 416.924(a). The three-step procedure requires the ALJ to determine whether a child:

(1) is performing substantial gainful activity;

(2) has a "severe" impairment or combination of impairments; and

(3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing").

*Phillips v. Astrue*, No. 1:11CV2412, 2012 U.S. Dist. LEXIS 90497, *3 (N.D. Ohio June 29, 2012), (citing 20 C.F.R. § 416.924(a)-(d)).

For purposes of Step Three, to *meet* a Listing, the impairment(s) must be substantiated by

medical findings shown or described in the listing for that impairment. 20 C.F.R. § 416.925(d). To *medically equal* a Listing, the impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a). To *functionally equal* a Listing, the impairment(s) must be of listing-level severity. In other words, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

When determining whether the impairment functionally equals the Listing, the ALJ considers all relevant factors, including, but not limited to: (1) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment. 20 C.F.R. § 416.926a(a)(1)-(3). To make a functionally equivalent determination, the ALJ begins by evaluating how the child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b). The ALJ considers how the child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;
>
> (iii) interacting and relating with others;
>
> (iv) moving about and manipulating objects;
>
> (v) caring for yourself; and,
>
> (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

The ALJ reviews these domains to determine if the child's limitations are marked or

extreme. 20 C.F.R. § 416.926a(e). When assessing whether the child has marked or extreme limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe. 20 C.F.R. § 416.926a(a). The ALJ must also consider the interactive and cumulative effects of the impairment(s) in any affected domain. 20 C.F.R. § 416.926a(c).

A marked limitation is defined in part as a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(1). It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. §416.926a(e)(2)(i). A child has a marked limitation in a domain when the impairment "interfere(s) seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).

An extreme limitation is the rating for the worst limitations. 20 C.F.R. §416.926a(e)(3). "However, 'extreme limitation' does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R § 416.926a(e)(3)(i). An "extreme" limitation exists when the impairment "interfere(s) very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).

If the impairment meets, medically equals, or functionally equals the Listing, *and* satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both requirements are not satisfied, then the child is not disabled. 20 C.F.R. § 416.924(d)(2).

### V.    Summary of the ALJ's Decision

1)    The claimant was born on ***, 2003. Therefore, he was an adolescent on February 27, 2017, the date application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2)    The claimant has not engaged in substantial gainful activity since February 27, 2017, the application date (20 CFR 416.924(b) and 416.971 *et seq*.).

3)    The claimant has the following severe impairments: congenital deformity of the left hand, attention deficit hyperactivity disorder('ADHD'), generalized anxiety disorder, and depression (20 CFR 416.924(c)).

4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5)    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6)    The claimant has not been disabled, as defined in the Social Security Act, since February 27, 2017, the date the application was filed (20 CFR 416.924(a)).

(Tr. 13-26).

In reaching the conclusion that MGS was not disabled, the ALJ evaluated his abilities under all six domains of functioning and made the following findings:

1. Less than marked limitation in "acquiring and using information." (Tr. 20).

2. Less than marked limitation in "attending and completing tasks." (Tr. 21).

3. Less than marked limitation in "interacting and relating with others." (Tr. 22).

4. Less than marked limitation in "moving about and manipulating objects." (Tr. 23).

5. Less than marked limitation in "ability to care for yourself." (Tr. 24).

6. Less than marked limitation in "health and physical well-being." (Tr. 25).

## VI.    Law and Analysis

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.    Smith's Assignments of Error

Smith asserts the ALJ erred at Step Three of the sequential analysis. (R. 13, PageID# 390, 394). During the Step Three analysis the ALJ was required to consider whether MGS's impairment or combination of impairments either 1) meet, 2) medically equal(s) or 3) are the functional equivalent in severity to a listed impairment. 20 C.F.R. § 416.924(a)-(d). The ALJ determined that MGS's impairments did not meet, medically equal, or functionally equal a listed impairment. (R.

14-26). Smith contends this conclusion lacks the support of substantial evidence. (R. 13, PageID# 390, 394). Specifically, Smith contends that MGS had marked limitations in at least two areas of functioning and therefore his impairments were functionally equivalent in severity to a listed impairment, and that the ALJ did not explain the rationale for discounting Smith and MGS's subjective statements on these issues. (R. 13, PageID# 390, 394).

### 1. The ALJ's Evaluation of the Functional Domains

Smith contends that the ALJ should have determined that MGS had at least marked limitations in two of the six domains: 1) interacting and relating with others, and 2) moving about and manipulating objects.[4]  The Commissioner asserts that the ALJ's conclusions were reasonably supported by the evidence and argues that Smith has failed to establish otherwise. (R. 16, PageID# 405). The ALJ's decision must stand if reasonable evidence supports the ALJ's conclusion, even if there is also evidence in the record that supports Smith's argument. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Before specifically addressing the individual domains, the ALJ's decision discussed the record evidence over the course of five pages. (Tr. 14-19). The ALJ discussed and analyzed the hearing testimony, (Tr. 15-6), MGS's medical records, (Tr. 16-17), the October 2018 counseling assessment, (Tr. 17), and the June 8, 2017 psychological evaluation. (Tr. 18).

Regarding the June 8, 2017 psychological evaluation, the ALJ explained that MGS had progressed significantly in terms of his mental impairments since the exam was completed. (Tr. 18). Further, the ALJ considered the evaluation and pertinent record evidence as follows:

> The functional assessment was almost entirely a repetition of the reports of the claimant and mother with no objective evidence noted other than intact ability to

---

[4] Smith does not challenge the ALJ's determinations regarding the four remaining domains and, therefore, those are not addressed here.

follow directions during the exam and satisfactory concentration during the exam. It offers little in the way of actual opinion evidence with regard to the four domains reviewed. Looking at the record as a whole, there is evidence that the claimant is a bright student not particularly challenged by school with the ability to get good grades with little studying (6F, 5F). Thus, with regard to the domain of acquiring and using information, the reports of difficulty in the past with oral instructions, memory problems, needing to have things repeated, and poor comprehension despite good reading and writing abilities is not supported. The claimant has had generally well controlled ADHD and has been doing well in school with no history of special education or an individual education plan (IEP) or any other special assistance needed. He also did very well on the mini cognitive assessment at the evaluation. Therefore, he has at most a less than marked limitation in this domain. The records also supports a new diagnosis of depression just after this evaluation that warrants consideration with regard to the domains not done here. Therefore, as for the opinion of the psychology examiner, I accept his diagnosis and the fact that overall his examination and conclusions do not support marked limits in any domain. I give partial weight to this opinion evidence to that extent, but note that he generally does not offer any professional functional opinions, but instead simply restates what the claimant and his mother told him, and the report is given little weight to that extent (4F). The state agency consulting doctors found the claimant to have no limitation in the domains of health and physical well-being and attending and completing tasks, and less than marked limitations in the other four domains. I find him less than marked in attending and completing tasks as he does have ADHD, and while the medications are generally successful at treating symptoms and the claimant has no individual education plan (IEP), there is support for at least some deficits in attention. I also find him less than marked in the 'health' category considering the limited use of his left hand. Therefore, I give this opinion evidence significant weight as I agree with most of the suggested domain limits but find that the record does support some limits in the domain of attending and completing tasks and in health. I do note that the state agency consultants considered consultative exams from the claimant's 2013 filing, which is very remote to the current period and too old to reopen as it is more than 2 years prior to current filing date, and a SSI claim only. It is inappropriate to reconsider these opinions and I did not admit them into evidence in the current file as that claim cannot be reopened and these opinions were fully considered in connection with prior claim and will not be reweighed here.

(Tr. 19). Smith does not challenge the ALJ's assessment of the psychological report or the state agency consulting doctors' opinions.

### a)  Interacting and Relating with Others

In the domain of interacting and relating with others, the Commissioner considers how a

child initiates and sustains emotional connections with others. 20 C.F.R. § 416.926a(i). This domain involves the child's ability to develop and use the language of his community, cooperate with others, comply with rules, respond to criticism, and respect and take care of other's possessions. (*Id*.). These considerations are age specific. Adolescents should be able to initiate and develop friendships with same-age individuals and relate appropriate to other children and adults. 20 C.F.R. § 416.926a(i)(2)(v). Moreover, the regulations states:

> You should begin to be able to solve conflicts between yourself and peers or family members or adults outside your family. You should recognize that there are different social rules for you and your friends and for acquaintances or adults. You should be able to intelligibly express your feelings, ask for assistance in getting your needs met, seek information, describe events, and tell stories, in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v).

In finding that MGS had less than marked limitation in interacting and relating with others, the ALJ addressed the domain as follows:

> As for the domain of interacting and relating with others, the claimant was noted to get along with others well but did endure some bullying as a result of his hand deformity which caused him to isolate. He was also dealing with depression/sadness over the loss of his relationship with his father who was not visiting. The claimant was living with his mother and new baby sister and getting along well with them. He did report increased depression around the time of his sister's birth and the loss of any regular contact with his father, with some anxiety about their financial situation. While he was resistant to counseling, he actually did quite well with counseling and was able to increase his self-esteem with treatment for social anxiety issues. He became more outgoing and made good progress on his goals. He had no behavior issues at school and was noted to be cooperative with improving mental status exam findings with treatment. The latter records show the claimant to be happy, with improved self-esteem, being more outgoing and looking forward to getting a hand prosthesis. The claimant has reported enjoying singing in choir, playing video games with others, and weight lifting with friends. The record supports a less than marked limitation in this domain.

(Tr. 22-23).

Smith contends that MGS has "significant difficulty relating with others, particularly when it comes to interacting with people." (R. 13, PageID# 392). In support, Smith points to her and MGS's hearing testimony, Dr. Swearingen's psychological evaluation, and to MGS's intake therapy diagnostic assessment. (R. 13, PageID# 392). Smith concludes that these records "support at least marked limitations in the domain of interacting and relating to others." (*Id.*). Smith makes no argument that the ALJ did not consider these specific records or failed to apply the correct legal standards. *White*, 572 F.3d at 281. Rather, Smith takes issue with the ALJ's conclusion regarding the evidence, which would require this court to impermissibly re-weigh the evidence. *Brainard*, 889 F.2d at 681

The ALJ's decision makes clear that she considered, analyzed, and weighed the evidence Smith cites here in the context of the overall record. As noted above, the ALJ considered MGS's testimony that medication had improved his depression and anxiety, but that he was anxious when around a lot of people or when his hand was not covered, and that he did not talk to people in school he did not know. (Tr. 15). In addition, the ALJ recognized Smith's testimony that MGS does not like to go anywhere alone, "struggles with normal things, gets very anxious in public, and does not like to be around a lot of people." (Tr. 16). The ALJ noted MGS's mental health improvement after starting medication for anxiety and depression and that his ADHD was stable. (Tr. 17).

Regarding the October 2018 counseling assessment, the ALJ acknowledged that MGS reported avoiding large social gatherings for fear of rejection. (Tr. 17). While acknowledging the evidence regarding MGS's mental health impairments, the ALJ concluded that through medication and counseling, MGS had made such progress "to the point he had minimal to no depression with treatment and increased self-esteem with a more positive self-image and more outgoing nature. He

16

had plans for his future and was working on meeting his goals. His doctor was noting improved

mental status exam findings. At the hearing the claimant testified that he enjoyed singing in the

choir, playing video games, and swimming." (Tr. 18). Smith does not challenge the ALJ's

statements regarding MGS's improvements. Moreover, the ALJ's conclusion is supported by the

record. Smith's argument challenging the weight of the evidence is without merit.

### b)      Moving About and Manipulating Objects

In the domain of moving about and manipulating objects, the Commissioner considers how

a child moves his body from place to place and how he moves and manipulates objects (gross and

fine motor skills). 20 C.F.R. § 416.926a(j). These considerations are age specific. Adolescents

should be able to use their motor skills freely and easily to move around, should be able to

participate in a full range of individual and group physical activities, should show mature skills in

activities requiring eye-hand coordination, and should be able to write efficiently or type on a

keyboard. 20 C.F.R. § 416.926a(j)(2)(v).

In finding that MGS has less than marked limitation in interacting and relating with others,

the ALJ addressed the domain as follows:

> As for the domain of moving about and manipulating objects, the claimant does
> have a left hand deformity which compromises his ability to perform bimanual hand
> tasking but he has developed some compensatory skills with some assistive
> function present using his unimpaired left arm and unimpaired right upper
> extremity. He reported being able to use his left arm to hold an object against his
> chest but has no use of the small finger/thumb appendages on that left hand. This
> was a birth defect and the claimant does not have pain in his left hand or fingers.
> He reported some issues preparing food and buttoning clothes. He said he can play
> video games on the keyboard and enjoys doing so and can write using his right
> hand. He reported lifting weights saying he uses the machines as he cannot lift a
> weight bar, and said he can do push-ups. His counseling notes reflect that he has
> been weightlifting and feeling good about himself as a result. The psychological
> evaluation also reveal chores of including cleaning his room, caring for the dogs,
> sweeping the floors, washing the dishes, and taking out the trash (4F). The claimant

did participate in sports, but his mother withdrew him when he was teased. Thus, while the claimant has some issues manipulating objects due to his left hand deformity, this has not resulted in significant gross motor issues and he utilizes compensatory skills to perform tasks. The claimant has had normal physical exam findings with the exception of his left hand deformity, and he receives no special services or accommodations at school. The State agency medical consultants found the claimant to be less than marked in this domain and that finding is consistent with the overall record.

(Tr. 23-24).

Smith contends that cumulative effect of MGS's "hand deformity and corresponding mental impairments takes a great toll on his daily life" and that MGS "fits squarely into one of the examples of 'limitations' in this domain, as he has difficulty with fine motor movements and coordination." (R. 13, PageID# 393-94.). Social Security Regulation 09-6p, in relevant part, provides examples of limitations in the domain of moving and manipulating objects. SSR 09-6p. However, the examples are provided with the caution that "[t]hey are not the only examples of limitations in this domain, nor do they necessarily describe a "marked" or an "extreme" limitation." *Id.*

A child has a marked limitation in a domain when the impairment "interfere(s) seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). Smith points to hearing testimony to support her argument regarding the effects MGS's hand impairment have on his daily life. (R. 13, PageID# 394). As noted above, the ALJ specifically recognized and analyzed Smith and MGS's hearing testimony throughout the decision. (*see*, Tr. 15-16). The ALJ's decision regarding this domain, however, was not limited to the hearing testimony. For example, in discussing the October 2018 counseling assessment, the ALJ noted that MGS reported "having a deformed hand but no limitations as to daily living[.]" (Tr. 17, 229). The ALJ considered that MGS did not need any special services or accommodations to function at

school. (Tr. 24). Finally, the ALJ noted that the state agency medical consultants' opinions that MGS was less than marked in this domain were consistent with the overall record. (Tr. 24). Once again, Smith's argument does not challenge the evidence analyzed and relied upon by the ALJ, but rather takes issue with ALJ's conclusion regarding the evidence. However, as cautioned above, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard*, 889 F.2d at 681. Accordingly, Smith's assignment of error is without merit.

##### 2.    The ALJ's Determination of Claimant's Subjective Statements

Smith's second assignment of error contends that the ALJ did not provide an explanation for discounting the subjective symptoms of record. (R. 13, PageID# 394). Specifically, Smith asserts that the ALJ only used boilerplate language in discussing MGS's subjective symptoms. (R. 13, PageID# 394). The Commissioner asserts that the ALJ thoroughly considered the regulatory factors relevant to subjective symptom assessment. (R. 16, PageID# 412). The Court concludes that, reviewing the opinion as a whole, the ALJ sufficiently considered and discussed the subjective symptoms.

An ALJ is not required to accept a claimant's subjective complaints. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *accord Sorrell v. Comm'r of Soc. Sec.*, 656 Fed. App'x 162, 173 (6th Cir. 2016). Nevertheless, while an ALJ's credibility determinations concerning a claimant's subjective complaints are left to his or her sound discretion, those determinations must be reasonable and supported by evidence in the case record. See, e.g., *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("the ALJ must cite some other evidence for denying a claim for pain in addition to personal observation").

"In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a

single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2017 WL 5180304 at *10 (Oct. 25, 2017). Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. Moreover, a reviewing court should not disturb an ALJ's credibility determination "absent [a] compelling reason," *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and "in practice ALJ credibility findings have become essentially 'unchallengeable.'" *Hernandez v. Comm'r of Soc. Sec.*, 644 Fed. App'x 468, 476 (6th Cir. 2016) (citing *Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109, 113 (6th Cir. 2010)).

An ALJ conducts a two-part analysis to evaluate a claimant's subjective statements of pain when the symptoms rather than that underlying condition form the basis of the disability claim. *Rogers*, 486 F.3d at 247; *see also* SSR 16-3P, 2016 SSR LEXIS 4 at *5, 2017 WL 5180304, at *3-*4. First, the ALJ must determine whether there is "an underlying medically determinable physical impairment [MDI] that could reasonably be expected to produce the claimant's symptoms." *Id.* (citing 20 C.F.R. § 416.929(a)). Here, the ALJ's decision found the first step was satisfied and states that MGS's medically determinable impairments "could reasonably be expected to produce the alleged symptoms." (Tr. 16).

After step one is satisfied, an ALJ—when considering the intensity, persistence, and limiting effects of an individual's symptoms—should consider the following seven factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side

effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5)

treatment, other than medication, an individual receives or has received for relief of pain or other

symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or

other symptoms; and, (7) any other factors concerning an individual's functional limitations and

restrictions due to pain or other symptoms. SSR 16-3p at *4-8. While an ALJ is not required to

explicitly address all these factors, the ALJ should sufficiently articulate specific reasons for the

credibility determinations so that the claimant and any subsequent reviewer can "trace the path of

the ALJ's reasoning." *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

Here, the ALJ's decision satisfied that standard and concluded as follows:

> [T]he statements concerning the intensity, persistence and limiting effects of these
> symptoms are not entirely consistent with the medical evidence and other evidence
> in the record for the reasons explained in this decision. As for statements about the
> intensity, persistence, and limiting effects of the claimant's symptoms, they are
> inconsistent with the actual reports in treatment records, objective evidence,
> treatment history, and activities of daily living. I carefully considered the mothers'
> reports and the testimony, but overall these do not support marked or extreme
> limitations in any domain.

(Tr. 16). Smith attempts to discount the above language as boilerplate and contends that ALJ's

decision lacked an explanation regarding why Smith and MGS's testimony did not support marked

or extreme limitations in any domain. (R. 13, PageID# 395). In addition, Smith contends that the

ALJ did not give "any explanation throughout the rest of her decision which could be construed

as an explanation for her credibility finding." *Id.* The above language, however, is incorporated

into the ALJ's multipage discussion explaining her conclusion that MGS's impairments did not

functionally equal a listing. As noted in the disposition of Smith's first assignment of error, the

ALJ detailed the reasoning underlying the decision's determinations. (Tr. 14-26). The court

concludes that the ALJ provided sufficient reasons to support the conclusion that Smith and MGS's

subjective statements did not support marked or extreme limitations in any domain.

For example, the ALJ's decision explained that according to Dr. Timperman's records, MGS is a physically healthy teenager with normal findings on exam except for his congenital hand deformity. (Tr. 16). The ALJ pointed to Dr. Timperman's records noting that "[m]entally, he has been on ADHD medications since first grade with reasonably well managed symptoms. The mother testified as to some issues when the medication wears off at night only. The claimant admitted that he focuses better on medications." (Tr. 16). According to the medical records, after MGS started medication for depression and anxiety, "the mother reported that he was more interactive and positive." (Tr. 17). MGS reported improved depression and doing well in school. It was noted that he was more talkative. The ALJ noted that in September 2018, MGS reported to Dr. Timperman that his ADHD symptoms were suppressed with medication, denied depression or social mental concerns, and school was going well. (Tr. 17). Further, relying upon specific medical records, the ALJ explained that MGS "achieved goals of improved social relationships, decreased disruptive behavior, improved academic performance, increased independence in self-care and homework, improved self-esteem and enhanced safety in the community." (R. 17).

The ALJ further explains that the evidence established that MGS's mental health impairments significantly improved with therapy and medication "to the point he had minimal to no depression with treatment and increased self-esteem with a more positive self-image and more outgoing nature. He had plans for his future and was working on meeting his goals. His doctor was noting improved mental status exam findings. At the hearing the claimant testified that he enjoyed singing in the choir, playing video games, and swimming." (Tr. 18). When considering the decision as a whole, the ALJ fully set forth the reasons why MGS and Smith's subjective statements did not support a finding that MGS had marked limitations in any of the functional domains.

Accordingly, Smith's second assignment of error is without merit.

**VII.    Conclusion**

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: September 27, 2021